989 A.2d 1277

**Joseph VICARI as Administrator of the Estate of Barbara Vicari, Deceased**

v.

**Joseph R. SPIEGEL, M.D., Pramila Rani Anne, M.D. and Jefferson Radiation Oncology Associates.**

**Appeal of Joseph R. Spiegel, M.D.**

**Joseph Vicari as Administrator of the Estate of Barbara Vicari, Deceased**

v.

**Joseph R. Spiegel, M.D., Pramila Rani Anne, M.D. and Jefferson Radiation Oncology Associates.**

**Appeal of Pramila Rani Anne, M.D. and Jefferson Radiation Oncology Associates.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 2009.

Decided March 25, 2010.

Castille, J., filed a concurring opinion in which Baer, J., joined.

Saylor, J., filed a concurring opinion in which Eakin, J., joined.

---

Bartholomew C. Tuttle, Paul E. Peel, O'Brien & Ryan, L.L.P., Plymouth Meeting, for Pramila Rani Anne, M.D. and Jefferson Radiation Oncology Associates.

Robert B. Hoffman, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, for Amicus Curiae Pennsylvania Medical Society.

Fredric L. Goldfein, Deborah Marie Knight, Goldfein & Joseph, P.C., Philadelphia, for Joseph R. Spiegel.

Stephen Edward Raynes, Gerald A. McHugh, Jr., Raynes McCarty, Philadelphia, for Joseph Vicari.

George Gerasimos Rassias, Media, Schmidt, Kirifides, Pearson, Koutcher & Fridkin, P.C., for Amicus Curiae Pennsylvania Association for Justice.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice McCAFFERY.

The issue before the Court in this case concerns the qualifications an expert witness must possess in order to testify regarding the standard of care in a medical professional liability case against a physician, pursuant to the Medical Care Availability and Reduction of Error ("MCARE") Act.[1]

Joseph Vicari ("Appellee") brought a medical professional liability claim against Joseph R. Spiegel, M.D.; Pramila Rani Anne, M.D.; and Jefferson Radiation Oncology Associates (collectively "Appellants") after Appellee's wife, Barbara Vicari, died from metastatic tongue cancer on April 1, 2002, at 39 years of age.[2] Dr. Spiegel, an otolaryngologist, had surgically removed Mrs. Vicari's tumor on March 6, 2001, and then had continued to serve as the primary physician responsible for management of her cancer. Dr. Anne, a radiation oncologist, had treated Mrs. Vicari post-surgically with a course of radiation therapy. The gravamen of Appellee's malpractice claim against these two physicians was that they had never discussed with Mrs. Vicari the possibility of post-surgical follow-up treatment with chemotherapy, nor referred her to a medical oncologist for such a discussion. In Appellee's view, this omission was particularly egregious because the surgical pathology report on the specimens removed during Mrs. Vicari's

1. Act of March 20, 2002, P.L. 154, No. 13, 40 P.S. §§ 1303.101–1303.1115.

2. The original complaint, filed December 13, 2002, also named numerous other defendants, each of whom either was dismissed from the suit or settled with Appellee. None of the other originally-named defendants is involved in this appeal.

surgery suggested that she had a high risk of tumor recurrence and metastasis.[3]

At a jury trial presided over by the Honorable Esther R. Sylvester, Appellee presented testimony from two expert witnesses: Ronald H. Blum, M.D., a medical oncologist, and Peter Berman, M.D., an otolaryngologist. Appellee also presented excerpts from Dr. Spiegel's deposition testimony, as well as testimony by Appellee himself and the Vicaris' two children. Appellee then rested his case just prior to the lunch recess on May 2, 2006.

Immediately after the recess, Appellee's counsel made an oral motion to reopen his case because he was unsure whether Dr. Berman had used the words "to a reasonable degree of medical certainty" during his expert opinion testimony. Notes of Testimony ("N.T."), 5/2/06, at 101–02. Appellants' counsel objected to Appellee's motion to reopen, and following argument, the court denied Appellee's motion and struck Dr. Berman's testimony. *Id.* at 111, 121.

Counsel for Dr. Spiegel then made an oral motion for compulsory nonsuit, arguing that Dr. Blum was not competent to testify against Dr. Spiegel or Dr. Anne as to the applicable standard of care, because Dr. Blum was not board certified in the same field as either of the defendant physicians.[4] *Id.* at 112–13, 127. Counsel further contended that the lack of common board certification between Dr. Blum and either Dr. Spiegel or Dr. Anne was "a threshold question which is kind of a black and white issue" and a "fatal flaw in the case." *Id.* at 113. Counsel for Dr. Anne joined in the oral motion. *Id.* at 120. Following argument, the trial court accepted Appellants'

3. More specifically, the pathology report indicated that the anterior margin of Mrs. Vicari's tumor was "positive for carcinoma at [the] cauterized base," that there was perineural invasion, and that, in one out of the thirty-four lymph nodes examined, there was a two millimeter focus of metastatic squamous cell carcinoma. Surgical Pathology Report, dated 3/6/01, at 2, 3.

4. As additional grounds for their motion for nonsuit, Appellants also contended that Appellee had not established causation. Notes of Testimony ("N.T."), 5/2/06, at 118. This issue was not addressed by the trial court and is not before us on appeal.

contention that Dr. Blum was not competent to testify and struck his testimony as well. With the testimony of both experts stricken, the trial court granted Appellants' motion for nonsuit.[5] *Id.* at 131. Appellee's motion to remove the nonsuit was denied, and the trial court entered judgment in favor of Appellants.

Appellee appealed to the Superior Court, arguing that the trial court had abused its discretion both by striking Dr. Berman's testimony because it was allegedly not rendered to the requisite degree of medical certainty, as well as by striking Dr. Blum's testimony because, under the MCARE Act, he allegedly did not qualify as an expert witness as to standard of care. *Vicari v. Spiegel,* 936 A.2d 503, 508–09 (Pa.Super.2007).[6] The Superior Court reversed and remanded for a new trial. *Id.* at 515. With regard to Dr. Berman's opinion testimony that Appellants' failure to refer Mrs. Vicari for chemotherapy

5. At trial, the court did not explicitly state its reasons for finding Dr. Blum not competent to testify against Dr. Spiegel or Dr. Anne; furthermore, in its published opinion, the trial court did not address at all the issue of Dr. Blum's competence to testify, apparently because it did not deem the issue "worthy of comment." *See Vicari v. Spiegel,* 1 Pa. D. & C. 5th 1, 2 (Phila.Ct.Com.Pl.2007). Based on the context of the trial court's statements at trial, we agree with the Superior Court that the trial court accepted defense counsel's argument that the MCARE Act required Dr. Blum to be board certified by the same board(s) as the defendant physicians in order to testify against them as to standard of care. *See Vicari,* 936 A.2d at 513–14 n. 11 (Pa.Super.2007) (citing N.T., 5/2/06, at 112, 131).

6. In addition, Appellee argued before the Superior Court that the trial court had abused its discretion by denying his motion to reopen his case to permit Dr. Berman to state that his opinions were, indeed, held to a reasonable degree of medical certainty. *Vicari,* 936 A.2d at 508–09. After concluding, contrary to the trial court's finding, that Dr. Berman's opinion *was* expressed with the requisite degree of reasonable certainty, the Superior Court declined to address whether the trial court had abused its discretion by denying Appellee's motion to reopen. *Id.* at 512 n. 9.

Finally, Appellee argued that the trial court had abused its discretion by failing to find the deposition testimony of Dr. Spiegel sufficient to avoid an entry of nonsuit, particularly when combined with Dr. Blum's testimony as to causation. *Id.* at 509, 515. The Superior Court determined that it was unnecessary to address this issue because it had already concluded that the trial court had erred by striking the testimony of Appellee's expert witnesses and by granting the nonsuit. *Id.* at 515.

had increased her risk for metastasis, the Superior Court held that, taken in its entirety, the testimony had been rendered to a reasonable degree of medical certainty. *Id.* at 511. With regard to Dr. Blum, the Superior Court concluded that, under the MCARE Act, he was indeed qualified to testify that Appellants had deviated from the applicable standard of care by failing to discuss with Mrs. Vicari the option of chemotherapy and failing to refer her to a medical oncologist for this purpose. *Id.* at 515.

Appellants then sought allowance for appeal from this Court, challenging the propriety of the Superior Court's holding that the trial court had committed error when it had found Dr. Blum unqualified to testify against them.[7] We granted allowance of appeal on the following issue:

Whether [Appellee's] medical oncology expert [Dr. Blum] was qualified to render standard of care opinions against an otolaryngologist and radiation oncologist under Section 512 of the Medical Care Availability and Reduction of Error Act. 40 P.S. § 1303.512.

*Vicari v. Spiegel,* 601 Pa. 375, 973 A.2d 408–09 (2009).

With passage of the MCARE Act, the General Assembly created a more stringent standard for admissibility of medical expert testimony in a medical malpractice action by the imposition of specific additional requirements not present in the common law standard. *Gbur v. Golio,* 600 Pa. 57, 963 A.2d 443, 452 (2009) (Opinion Announcing the Judgment of the Court); *id.* at 464 (Greenspan, J., concurring) (agreeing that, with the MCARE Act, the General Assembly raised the standards for an expert witness testifying to a physician's standard of care, but also noting that the statute permitted waiver of certain requirements under appropriate circumstances); *Wexler v. Hecht,* 593 Pa. 118, 928 A.2d 973, 986 (2007) (Castille, J., dissenting). The MCARE Act's provisions as to the requisite qualifications for an expert witness testifying in a medical malpractice action against a physician are

7. In Appellants' Petitions for Allowance of Appeal, they did not challenge the Superior Court's ruling concerning the requisite medical certainty of Dr. Berman's opinion testimony.

found in Section 512, which provides, in relevant part, as follows:

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

\* \* \* \* \* \*

(c) **Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

\* \* \* \* \* \*

(e) **Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert

388

possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

Thus, pursuant to Section 512, to testify on a medical matter in a medical malpractice action against a defendant physician, an expert witness must be a **licensed and active,** or a recently retired, **physician.** In addition, in order to render an opinion as to the applicable standard of care, the expert witness must be **substantially familiar** with the **standard of care for the specific care in question.** Furthermore, the expert witness must practice in the **same subspecialty** as the defendant physician, **or** in a subspecialty with a **substantially similar standard of care for the specific care at issue** ("same specialty requirement"). Finally, if the defendant physician is board certified, the expert witness must be **board certified by the same or a similar board** ("same board certification requirement"). Importantly, the expert witness must meet **all** of these statutory requirements in order to be competent to testify. However, there is an **exception** to the same specialty and same board-certification requirements: if a court finds that an expert witness has sufficient **training, experience, and knowledge** to testify as to the applicable standard of care, as a result of **active involvement** in the defendant physician's subspecialty or **in a related field of medicine,** then the court may waive the same specialty and same board certification requirements.

This Court has directly addressed the requirements of Section 512 only infrequently. In *Wexler, supra,* we held that a podiatrist was not competent to testify as an expert witness in a medical malpractice action against an orthopedic surgeon because a podiatrist does not possess an unrestricted physician's license, as required under subsection 512(b)(1). *Wexler, supra* at 974, 981–82.

More recently, in *Gbur, supra,* three of six participating members of this Court concluded that a radiation oncologist was competent to testify against a urologist regarding the standard of care for a prostate cancer patient. *Id.* at 463–65 (Greenspan, J., concurring). Relying on the exception set forth in subsection 512(e), the concurring justices concluded that the radiation oncologist was eminently qualified to testify in the action as a result of his active involvement in the diagnosis and treatment of numerous patients with prostate cancer. *Id.* at 464–65. The three other justices who participated in *Gbur* did not reach the merits of the expert witness's qualifications under the MCARE Act, but rather concluded that the issue had not been properly preserved and thus was waived. Nonetheless, the Court did express, albeit in *dicta,* its opinion concerning the application of subsection 512(e), particularly with regard to the meaning of the phrase "related field of medicine" as used in that subsection. *See* discussion in text, *infra.*[8]

8. The Superior Court has addressed the qualifications required of a medical expert to testify as to standard of care, pursuant to Section 512, on several occasions. In *Jacobs v. Chatwani,* 922 A.2d 950, 959 (Pa.Super.2007), the Superior Court held that "a board certified urologist, who performs pelvic surgery, was qualified under the MCARE Act to opine on the standard of care related to protection of the ureters during pelvic surgery [specifically, a hysterectomy] and to opine on diagnostic testing of urologic structures following pelvic surgery" in a medical malpractice suit against an obstetrician/gynecologist. In *Smith v. Paoli Memorial Hospital,* 885 A.2d 1012, 1018–19 (Pa.Super.2005), the Superior Court held that a board certified general surgeon and a board certified internist-medical oncologist were competent to testify against board certified gastroenterologists concerning the specific care at issue, which was the diagnosis of a patient with obscure gastrointestinal bleeding. The court concluded that the experts practiced in subspecialties with a substantially similar standard of care to that of the defendant gastroenterologists for the specific care at issue. *Id.* at 1022. The court also concluded that the experts possessed sufficient training, experience, and knowledge to testify as a result of their active involvement in a field of medicine related to that of the defendant physicians. *Id.* In *Herbert v. Parkview Hospital,* 854 A.2d 1285 (Pa.Super.2004), the Superior Court concluded that an expert who was board certified in internal medicine with subspecialties in pulmonary diseases and critical care medicine could testify against a physician who was board certified in internal medicine with a subspecialty in nephrology, when the specific care at issue was a failure to provide care for an allegedly obvious respiratory problem. In *Gartland v. Rosenthal,* 850 A.2d 671

Here, the legal issue presented is the same as the underlying legal issue in *Gbur:* how to interpret the limitations and exception set forth in Section 512 of the MCARE Act regarding medical expert testimony against a physician as to standard of care when the proffered or testifying expert practices in a different subspecialty and/or is board certified by a different board than the defendant physician. This is a question of law, and accordingly our standard of review is *de novo* and our scope of review is plenary. *Mazur v. Trinity Area School District,* 599 Pa. 232, 961 A.2d 96, 101 (2008). We must ascertain and effectuate the intent of the General Assembly based upon a reading of the entire statute. *Penn Jersey Advance, Inc. v. Grim,* 599 Pa. 534, 962 A.2d 632, 635–36 (2009).

The trial court here appears to have based its ruling that Dr. Blum was incompetent to testify as to standard of care against Drs. Spiegel and Anne on the misconception that the MCARE Act mandates that, if the defendant physician is board certified, then the testifying expert must be board certified by the same board. There was no dispute that Dr. Blum, Dr. Spiegel, and Dr. Anne were all board certified by different boards. *See infra.* There is also no dispute that certification by the same or a similar board is the general rule promulgated in subsection 512(c)(3); however, the final phrase of this subsection provides for an exception, set forth in subsection 512(e), which the trial court did not appear to recognize. Under the exception, a court may waive the same board certification and same specialty requirements if the court determines that the expert possesses "sufficient training, experience and knowledge" to testify as to standard of care "as a result of active involvement in . . . medicine in the applicable subspecialty or a related field of medicine." 40 P.S. § 1303.512(e).

(Pa.Super.2004), the Superior Court held that a neurologist was competent to testify against a radiologist with respect to the interpretation of an X–ray that had been taken for diagnosis of a head injury, in a case where the plaintiff alleged that the radiologist had failed to consider the possibility of a brain tumor.

Pursuant to the exception set forth in subsection 512(e), Dr. Blum's unchallenged and undisputed professional qualifications and activities established that he was competent to testify against Drs. Spiegel and Anne **as to the specific care at issue.** It is of utmost importance to stress that such a competency determination can be made only after delineation of precisely what is the specific care at issue and after consideration of what testimony the expert will render. With this caveat in mind, and to be absolutely clear, we reiterate what this case is **not** about: There is no allegation that Dr. Spiegel breached the applicable standard of care in his performance of Mrs. Vicari's surgery to resect the tumor, nor is there any allegation that Dr. Anne breached the applicable standard of care in her administration of radiation therapy to Mrs. Vicari. The **sole issue** is whether the standard of care applicable to Drs. Spiegel and Anne included the requirement to offer Mrs. Vicari the option of follow-up chemotherapy and to refer her to a medical oncologist for this purpose. Concerning this narrow question, we conclude that Dr. Blum was well qualified, under Section 512 of the MCARE Act, to testify as to his opinion even though he was board certified by a different board and practiced in a different subspecialty than the defendant physicians.

The exception set forth in subsection 512(e) provides that the court may waive same board and same specialty requirements if the proposed expert has sufficient training, experience, and knowledge to testify as a result of active involvement in a field of medicine "**related**" to the subspecialty of the defendant physician. The statute does not define the term "related field of medicine." However, in the Opinion Announcing the Judgment of the Court in *Gbur*, Justice Saylor did consider, albeit in *dicta*, the meaning of this phrase in the context of subsection 512(e), and suggested that it "must mean more than fields of medicine which are 'related' in the most generic sense of the word, since Section 512(e) serves as a component of reform legislation designed to meaningfully enhance the standards governing the admissibility of expert testimony in medical professional liability cases." *Gbur, su-*

*pra* at 459 (Opinion Announcing the Judgment of the Court). Justice Saylor continued his interpretation as follows: "[T]he statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field." *Id.* Here, we expressly adopt the above two statements from *Gbur's* opinion announcing the judgment of the court as explicative of subsection 512(e).

In addition, we further explicitly hold that the "relatedness" of one field of medicine to another for purposes of subsection 512(e) cannot be established in a broad and general sense that will henceforth be applicable to all situations and all claims. Rather, the "relatedness" of one field of medicine to another, under subsection 512(e), can only be assessed with regard to **the specific care at issue.** Two fields of medicine may be "related" with respect to certain specific issues of care, but unrelated with respect to other specific issues of care. Determining whether one field of medicine is "related" to another with respect to a specific issue of care is likely to require a supporting evidentiary record and questioning of the proffered expert during *voir dire.* This interpretation of "related field of medicine" is most compatible with the text of subsection 512(e) as a whole, which sets forth an exception to the formal same specialty and same board certification rules for experts otherwise qualified to testify.[9]

9. In *Miville v. Abington Memorial Hospital,* 415 F.Supp.2d 500 (E.D.Pa. 2005), the federal district court was called upon to predict how this Court would interpret subsection 512(e), particularly with respect to its use of the phrase "related field of medicine." Contrary to our holding here, the district court concluded that the relatedness of two fields of medicine, and hence the eligibility for a subsection 512(e) waiver, was *not* dependent on the specific care at issue. *Id.* We note that the federal court provided no guidance as to what criteria it would use in determining whether two fields of medicine were "related;" it simply concluded that the specific care at issue was not relevant. We are, of course, not bound by decisions of the lower federal courts, especially where the question is one of Pennsylvania law. *See Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918, 977 n. 44 (2006). *Miville's* analysis

Here, there was no question that Dr. Blum, Dr. Spiegel, and Dr. Anne were certified by different boards and practiced in different specialties. Dr. Blum was board certified in internal medicine with a subspecialty in medical oncology by the American Board of Internal Medicine. Dr. Spiegel was board certified in otolaryngology by the American Board of Otolaryngology. Dr. Anne was board certified in radiation oncology by the American Board of Radiology. In a general sense, these fields of medicine would not appear to be "related," but the evidentiary record established that **with regard to the specific care at issue,** *i.e.,* whether Mrs. Vicari should have been given the option of chemotherapy and a referral to a medical oncologist, these fields surely were "related" for purposes of subsection 512(e) **in this case.**

This relatedness ultimately springs from the complexities and realities of modern cancer therapy, during which an individual cancer patient often obtains different treatments under the auspices of several different specialties of medical practice, and different specialists often treat the patient in a sequential but coordinated manner. Given the complex and multi-disciplinary nature of many treatment regimens, consensus decisions as to the care of individual cancer patients are often reached by a multi-disciplinary panel of physicians known as a "tumor board," the composition and activities of which were explored at trial. As Dr. Blum's undisputed testimony made clear, patients in accredited cancer centers are routinely reviewed by a "tumor board," which consists of physicians from a variety of specialties and subspecialties, including medicine, surgery, diagnostic radiology, radiation oncology, and pathology. N.T., 5/1/06, at 68, 103. Dr. Blum explained that, at the tumor board conference, "there's a full discussion of the various factors that go into decision making" and "then decisions are made" concerning the cancer patient. *Id.* at 68. Dr. Spiegel, in his deposition testimony read in part at trial, stated that he had presented Mrs. Vicari's case to the "head and neck tumor board, which is a joint discussion of

is unpersuasive, and we conclude that the federal court mis-predicted this Court's interpretation of subsection 512(e).

multiple physicians that take care of head and neck cancer, including radiation oncologists and **medical oncologists** to assure that the consensus of opinion is available to the patient." [10] N.T., 5/2/06, at 5 (emphasis added). Thus, for the specific care at issue here—whether, following Mrs. Vicari's surgery, which was conducted by an otolaryngologist, and her radiation therapy, which was administered by a radiation oncologist, she should have been offered chemotherapy and accordingly referred to a medical oncologist—we conclude that medical oncology is a "related field of medicine" to otolaryngology and radiation oncology, pursuant to subsection 512(e).

The conclusion that Dr. Blum, as a practicing medical oncologist, was actively involved in a related field of medicine to that of Drs. Spiegel and Anne does not, of course, end the inquiry required in subsection 512(e). The question remains whether Dr. Blum, because of his active involvement in medical oncology, had sufficient training, experience, and knowledge to testify as to the specific standard of care at issue. We conclude that he unquestionably meets this statutory standard.

As a medical oncologist, Dr. Blum had maintained a clinical practice for thirty years, encompassing the administration of chemotherapy to cancer patients, including head and neck cancer patients. N.T., *voir dire,* 5/1/06, at 61–62. During the same period of time, Dr. Blum served on, and sometimes chaired, tumor boards, in which capacity he was part of the multidisciplinary panel that reviewed and discussed individual patients to reach consensus decisions as to which treatment or combination of treatments should be recommended.[11] *Id.* at

10. Dr. Spiegel did not testify further as to the deliberations or recommendations of the head and neck tumor board with regard to Mrs. Vicari's case.

11. Out of an abundance of caution, we hasten to clarify here that we are **not** suggesting that service on a tumor board is determinative in establishing that a proffered expert is competent to testify, under subsection 512(e), against any other physician who also treats cancer patients. That is clearly not the case. However, a proffered expert's service on a tumor board may constitute one relevant and significant factor in a court's determination as to whether the expert has "suffi-

67. In addition, for over thirty years, he had conducted clinical studies designed to test new drugs and new treatments, particularly with regard to how to combine surgery, radiation, and chemotherapy treatments to achieve the best outcome. *Id.* at 64–65. He chaired a committee that made recommendations to the federal government concerning the funding of major cancer centers, and served on a number of external scientific advisory boards for various cancer centers. *Id.* at 66. In fact, Dr. Blum testified that one of the external scientific advisory boards on which he has served was the board for Thomas Jefferson University Cancer Center. *Id.* He has been a professor of medicine at the Albert Einstein College of Medicine and the Director of the Cancer Center and Programs for the Beth Israel Cancer Center in New York City since 1999. *Id.* at 61, 63; Curriculum Vitae of Ronald H. Blum, M.D., at 2. Given all these unchallenged and unrefuted professional qualifications and activities, we readily conclude that Dr. Blum was competent to offer his opinion as to whether the standard of care applicable to Dr. Spiegel's and Dr. Anne's treatment of Mrs. Vicari included discussing with her the option of follow-up chemotherapy and referring her to a medical oncologist for this purpose.

In sum, we hold that, under subsection 512(e), Dr. Blum had sufficient training, experience, and knowledge to testify as to standard of care for the narrow, specific issue of care presented, due to his active involvement in a field of medicine related to that of the defendant physicians.

Order of the Superior Court affirmed and case remanded for a new trial. Jurisdiction relinquished.

cient training, experience and knowledge" to testify as to the specific standard of care at issue. Subsection 512(e).

Similarly, the fact that two physicians in two subspecialties treat patients with the same condition does not establish that one is competent to testify against the other under subsection 512(e). The court must consider the entirety of the proposed expert's training, experience, and knowledge in order to determine if the proposed witness's expertise extends to the relevant standard of care in the defendant physician's field.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices BAER and TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice BAER joins.

Justice SAYLOR files a concurring opinion in which Justice EAKIN joins.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion. I write simply to address the waiver question Mr. Justice Saylor notes and to explain why I think it is appropriate to reach the merits here; and I also write to make two points of elaboration concerning the Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. §§ 1303.101–1303.1115.

As Justice Saylor correctly observes in his Concurring Opinion, until appellee rested his case, appellants never once objected to Dr. Blum's qualifications to give testimony on the applicable standard of care. Appellants did not move *in limine* to preclude Dr. Blum's testimony on the basis of the same board/subspecialty requirements of the MCARE Act, despite the fact that it was clear from Dr. Blum's *curriculum vitae*—forwarded months before trial—that he was a medical oncologist, and not a radiation oncologist, surgeon or otolaryngologist.

Similarly, during *voir dire* on his expert qualifications, appellants made no objection to appellee's offer of Dr. Blum as an expert witness on the standard of care, despite appellants' confirmation through cross-examination that he was not an otolaryngologist, a head and neck surgeon or a radiation oncologist. If appellants had objected at this early stage in the proceedings, the trial court would have had an opportunity to rule on the issue and appellee would have had the opportunity to attempt to cure any perceived defect under the MCARE Act construct. Instead, appellants waited until ap-

pellee rested his case to make a motion for nonsuit based in large part on Dr. Blum's failure to qualify as an expert under the strictures of the MCARE Act. There is obvious force in Justice Saylor's view that appellants waived their challenge by not raising it at the appropriate opportunity. Concurring Op. at 400, 989 A.2d at 1289. Nonetheless, I am satisfied to reach and decide the merits of this appeal.

Competing waiver arguments have been forwarded here: *i.e.*, appellee argues that appellants objected too late to Dr. Blum's qualifications, and appellants argue that appellee himself waited too late, until post-trial motions, to object that their successful argument in securing a nonsuit was untimely. The parties' respective arguments on waiver were presented to the Superior Court, but the panel's disposition of those arguments was quite perplexing. I set it forth in its entirety here:

> We acknowledge Plaintiff's argument that the defendants waived any objection to Dr. Blum's qualifications because they did not lodge an objection until the day after his testimony, during the argument on their motion for nonsuit. Indeed, any objections to Dr. Blum's qualifications could have been raised, at the earliest, in a pretrial motion *in limine* following receipt of his curriculum vitae and expert report or, at the very least, following voir dire on his qualifications. On the other hand, the defendants argue that Plaintiff waived his waiver argument because he failed to raise it during argument on the motion for nonsuit. Although we do not condone **the defendants' untimely objection to Dr. Blum's qualifications and find Plaintiff's waiver argument persuasive,** because we have determined that Dr. Blum was indeed qualified to render his opinion, **we decline to engage in an analysis of the parties' competing waiver arguments.**

*Vicari v. Spiegel,* 936 A.2d 503, 512 n. 10 (Pa.Super.2007) (emphases added). The panel, in contradictory fashion, purported both to find that appellants' objection to Dr. Blum's qualifications was untimely and not to pass upon that very waiver. Failure to pass upon the argument would be error,

since appellants had prevailed at trial. To avoid confusion, I would construe the panel's footnote disposition as: (1) effectively rejecting the current appellants' waiver argument (for otherwise the panel could not properly proceed to its merits reversal); and (2) declining to pass upon the current appellee's waiver argument (which was an alternative argument) because the panel, for unexplained reasons, preferred a merits disposition, which was in appellee's favor and was more useful, on retrial, than prevailing on a default argument.

For purposes of our review here, I am satisfied that the Superior Court's unclear waiver disposition, and the parties' renewal of their respective arguments on waiver in this Court, should be of no moment. In petitioning this Court for discretionary review, appellants did not pursue their waiver argument, nor did they argue that the Superior Court erred in its confused disposition of the argument, and we granted review limited to appellants' substantive MCARE Act claim.

The necessity to consider appellee's waiver argument is a closer question. Arguably, as the party prevailing below, appellee is free to raise properly preserved alternative arguments, and the Court is then free to determine which arguments to discuss (or to determine to dismiss the appeal on prudential grounds). *See generally,* Thomas G. Saylor, *Right for Any Reason: An Unsettled Doctrine at the Supreme Court Level and an Anecdotal Experience with Former Chief Justice Cappy,* 47 Duq.L.Rev. 489, 490, 494 (2009) (discussing countervailing arguments regarding Pennsylvania Supreme Court's authority to "sustain a valid judgment or order of a trial or lower appellate court for any valid reason appearing as of record," in order "to effectuate substantial justice"). *See also Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1157–59 (2006) (on direct appeal, affirming trial court's admission of evidence on alternative grounds not "proffered by the Commonwealth or the trial court"); *Commonwealth v. Sholcosky,* 553 Pa. 466, 719 A.2d 1039, 1047 (1998) (Saylor, J., dissenting) (dissenting from plurality decision in part because "an appellate court may sustain a correct judgment based upon any valid reason that is supported by the record"). But

even this proposition is not entirely clear here, because appellee did not prevail on any theory at the trial level. Nor is it entirely clear that he prevailed on his waiver argument before the Superior Court.

In these circumstances, I believe the Majority's decision to decline to reach either waiver argument is sound. We need not reach appellants' waiver argument because it simply is not encompassed in our grant of review.[1] And we need not reach appellee's waiver argument because it is not entirely clear that it is properly before us. Even if it were deemed available, passing upon it involves discretionary prudential concerns and,

1. Even if the waiver argument were deemed available to appellants, I would find it lacks merit. Appellants claim that appellee waited too long—until post-trial motions—to argue that appellants waived their challenge to Dr. Blum's qualifications. Ordinarily, if trial error is not raised by a litigant until post-trial filings, the claim is waived. *See* Pa.R.C.P. No. 227.1(b)(1) (post-trial relief may not be granted unless "grounds therefor, ... if then available, were raised in pre-trial proceedings, or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof, or other appropriate method at trial"). And so, appellee's argument on post-trial motions was untimely if it appears that appellee could, and should, have objected at trial that appellants' challenge to Dr. Blum's qualifications under the MCARE Act, raised at the nonsuit stage, was untimely. But I would hold that appellee was not obliged to raise this claim earlier. I believe that the belated timing of appellants' objection must be considered in assessing appellee's issue preservation obligations at the nonsuit stage. Obviously, the appropriate response to appellants' motion for nonsuit would have been an immediate, contemporaneous argument before the trial court that appellants lost their chance to object to Dr. Blum's qualifications when they failed to object during *voir dire* or during Dr. Blum's testimony (if not earlier during motions *in limine*). But, I would not require such foresight by a party under circumstances like those present here. As noted, appellants obviously could and should have raised the expert qualification-based challenge that, once accepted by the trial court, eviscerated appellee's entire case, during *voir dire* of appellee's expert—but they did not, which suggests that the timing here was not just belated, but strategic. The modern view of law does not favor trial by surprise or ambush; and finding a waiver here by appellee would invite, if not reward, such tactics. At a minimum, a party that would seek to prevail based upon such a tactic should make certain that its own position has been properly preserved; and appellants have not done that here. In my judgment, in these circumstances, appellee's post-trial motion may properly be viewed as the first appropriate opportunity after he was actually aggrieved where he was obliged to preserve his argument about appellants' late MCARE Act-based objection and resulting waiver.

in this case, the fact that a merits decision was rendered in a published decision below, that we specifically accepted merits review, that the merits have been briefed, and that the issue is of statewide import, all counsel in favor of the merits review the Majority undertakes.

On the merits, I offer the following two observations. First, as the Majority states, appellee's evidence amply established that as a medical oncologist Dr. Blum was qualified under Section 512(e) of the MCARE Act to render an opinion on the standard of care applicable to cancer treatment in the decedent's case. The MCARE Act obviously was designed to raise the bar for expert witness qualification in medical negligence cases. But the Act should not supplant common sense or the dictates of justice. Indeed, in my view, the Act cannot simply displace the trial court's evidentiary gate-keeping role such that traditional jurisprudential rules regarding the admissibility of expert witness testimony, deriving from bedrock precepts involving relevance and the overall truth-determining process, no longer apply. *See, e.g.,* Pa.R.E. 702 (witness qualified as expert by knowledge, skill, experience, training or education may testify in form of opinion); *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 528 (1995) (test to be applied when qualifying witness to testify as expert is whether witness has any reasonable pretension to specialized knowledge on subject under investigation).

Second, although the parties and the Majority do not focus upon the issue, this case reveals the pitfalls when the Legislature purports to dictate how the courts should determine evidentiary questions, which implicates trial concerns uniquely within the judicial realm. Section 512(e) states that the trial court "may" waive the MCARE Act's same specialty and board certification requirements if the court determines that the expert qualifies under the multiple parameters the provision then lists. The statute does not say the court "must" admit such testimony, only that it "may." The question then becomes by what standard should that power be exercised? The Majority here does not remand for the trial court to exercise the power so conferred; instead, we hold, as a matter

of law, that there is only one permissible ruling: the expert qualifies and must be permitted to testify. Does this ruling square with the language of the statute, or would the import of the statute, if deemed controlling, require a remand and a possible contrary conclusion? For my part, the answer is not in the MCARE Act, but in principles of jurisprudence: absent some competing concern (*e.g.*, cumulative testimony) where an expert so qualifies, not only would it be an abuse of discretion, it would be plain error not to permit the testimony.

Justice BAER joins this opinion.

Justice SAYLOR, concurring.

I would find any MCARE–based objection waived for failure to raise it in a timely manner.

In this regard, this Court has explained that the primary purpose of the requirement of a timely and specific objection is to ensure that the trial court has the opportunity to correct alleged trial errors. *See Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 260, 322 A.2d 114, 117 (1974). Other courts have also stressed that a timely and specific objection also affords an opposing party the opportunity to address the objection and, where appropriate, to cure a defect. *See generally* 75 Am.Jur.2d Trial § 312 (2008) (collecting cases).

*Gbur v. Golio*, 600 Pa. 57, 76 n. 12, 963 A.2d 443, 455 n. 12 (2009) (Opinion Announcing the Judgment of the Court). Here, it was not until Dr. Blum had completed his testimony and the plaintiff's record was closed that Appellants decided to place the court on notice that they viewed him as unqualified to render an expert opinion concerning whether they had breached the appropriate standard of care. By this time, it was too late for Appellee to cure any alleged deficiency in the witness's qualifications.[1]

---

1. The facts in the present case are arguably even more compelling than in *Gbur*. After Appellee offered Dr. Blum as an expert witness and examined him on *voir dire* concerning his qualifications, Appellants cross-examined him on *voir dire* regarding his background and qualifications, particularly as they related to the professional activities of Drs.

To the extent, moreover, that the majority's decision to dispose of the salient interpretive legal question on the merits can be justified as a salutary measure undertaken to provide guidance to the bench and bar, I am not opposed to such an effort, although I have previously articulated my belief that any holding should be applied prospectively only, and only to parties that have preserved the issue. *See Phillips v. Cricket Lighters*, 576 Pa. 644, 665, 841 A.2d 1000, 1012 (2003) (Saylor, J., concurring). As it turns out, the Court's present determination of the merits of that issue leads to the same disposition as if the case were expressly decided based upon waiver— affirmance of the Superior Court's order. Accordingly, I am able to concur rather than dissent relative to the mandate.

As for the merits, I agree with the majority to the degree it expressly adopts the principles set forth in the Opinion Announcing the Judgment of the Court in *Gbur. See* Majority Opinion, at 390, 989 A.2d at 1283 (quoting *Gbur*, 600 Pa. at 83– 84, 963 A.2d at 459). These precepts were intended to convey that the focus of subsection (e) is centered upon the relatedness of the fields of medicine as such, rather than the specific care at issue. In the next paragraph, however, the majority articulates a further holding that appears to be in some tension with *Gbur*. The majority indicates that the "relatedness" inquiry implicates "the specific care at issue" only. This seems difficult to reconcile with the pronouncements of the prior paragraph to the effect that the fields of medicine must be so closely intertwined that by their very nature they will

Spiegel and Anne. The defendants both concluded their cross-examination by informing the court, "That's all I have at this time." *See* N.T. May 1, 2006 at 73, 75; RR. 396a, 398a. In short, they declined to interpose any objection to the admission of Dr. Blum's testimony, although they were well aware of the purpose of that testimony and of the restrictions set forth in the MCARE Act. Additionally, Dr. Anne had moved *in limine* before trial to preclude Dr. Blum's testimony only to the extent it would rest upon medical literature published after the time of treatment. *See* RR. 202a. In her motion she made no mention of the MCARE Act. *See generally Commonwealth v. Arroyo*, 555 Pa. 125, 142, 723 A.2d 162, 170 (1999) ("[I]f the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived."); *Commonwealth v. Smith*, 604 Pa. 126, 158, 985 A.2d 886, 904 (2009) (same as to pre-trial severance motions).

tend to have substantially similar standards of care. In this regard, I note that the "substantially similar standard of care *for the specific care at issue* " rubric is used only in subsection (c), *see* 40 P.S. § 1303.512(c)(1), (2) (emphasis added), and not in subsection (e), where the focus instead rests on the relatedness of the fields of medicine as such. Thus, while I generally support the majority's interpretive efforts, I respectfully decline to join its analysis to the degree it can be understood to construe the exception provided by subsection (e) as permitting testimony by a medical expert whose field of specialty is not closely related to that of the defendant physician pursuant to the principles expressed—and presently adopted—in *Gbur.*

Justice EAKIN joins this concurring opinion.