ZULICK, J,
This matter comes before the court on plaintiff James Pellechia’s motion for a new trial following a medical malpractice trial that took place between August 5, 2014 and August 12, 2014. The jury returned a verdict in favor of the defendants, finding that defendant Yen Shou Chen, M.D. (Dr. Chen) did not breach the standard of care in the medical treatment he provided for Kathleen Pellechia.
Mr. Pellechia filed a motion for new trial on August *272 20, 2014. The transcript was ordered to be produced and matter was briefed and argued on November 3, 2014.
DISCUSSION
Plaintiff raises three evidentiary issues in seeking a new trial. The first is whether the court erred in allowing defense experts Dr. Adam Elfant, a gastroenterologist, and Dr. Paul Coady, a cardiologist, to testify to matters outside the scope of their expert reports. Secondly, plaintiff contends it was error to allow Dr. Chen’s nurses and office assistants to offer character evidence. Lastly, plaintiff contends that the court erred in permitting defense counsel to cross examine plaintiff’s expert cardiologist, Dr. Robert Stark, about a restriction on his medical license imposed following disciplinary proceedings in Connecticut. Defense counsel was permitted to establish that the Connecticut Department of Public Health entered into a consent order with Dr. Stark and what the consequences of that order were for Dr. Stark’s medical license.
A new trial is warranted if there was an abuse of discretion or an error of law committed in the course of the trial. Vallone v. Creech, 828 A.2d 760, 763 (Pa. Super.2003). The grant or refusal of a new trial lies within the discretion of the trial court and is based upon the facts and circumstances of each particular case. Nicholson v. Garris, 210 A.2d 164, 166 (Pa. 1965). “Appellant must...show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion....” Oxford Presbyterian Church v. Weil-McLain Co., Inc., 815 A.2d 1094, 1100 (Pa. Super. 2003).
The facts which gave rise to this case are as follows. Kathleen Pellechia was initially referred to Dr. Chen, a gastroenterologist practicing in East Stroudsburg, by Dr. Kesselring in 2006 for problems with anemia and iron deficiency. Dr. Chen saw Ms. Pellechia on April 19,2006. *273 He performed an endoscopy on April 25, 2006. During the procedure, he found and removed two polyps in Ms. Pellechia’s stomach. The surgical procedure involved severing the polyps and cauterizing the wounds with the endoscope. The pathology report found that the polyps were benign, but were subject to focal acute and chronic inflammation and epithelial erosion, which meant that they were subject to bleeding and were a possible cause of Ms. Pellechia’s anemia. Id. NT 128.
Ms. Pellechia returned to Dr. Chen on January 6,2010. At that time her complaints included daily stomach upset that had been occurring for four or five months. She had developed a new diagnosis of heart disease in the interim, which led to a failed stent procedure. She was taking blood thinning medications, Plavix and aspirin Id. NT 137. Dr. Chen scheduled an endoscopic procedure for January 13, 2010 to address Ms. Pellechia’s complaints. He was concerned about her cardiac condition and directed Ms. Pellechia to continue to take Plavix and aspirin until the day before the endoscopy. At that point she was to discontinue taking the medication until three days after the procedure. Id. NT 140. Dr. Chen told Ms. Pellechia that if he found polyps during the endoscopy, he might remove them as he had done in 2006. He also told her that there was an increased risk of bleeding because of the cardiac medication she had been taking, but that he felt confident he could manage that risk. Id. NT 145,146.
Dr. Chen performed the endoscopy on January 13, 2010. He discovered three polyps in the stomach, which he snared, removed and cauterized with the endoscope. Id. NT 155-59. After the procedure, Dr. Chen advised Ms. Pellechia that he had removed the polyps, and that if she had any “faintness, any weakness, whether she has any bleeding, any unusual diarrhea, [or] if she had chest pain or shortness of breath that she should either have the *274 answering service page me or call the office.” Id. NT 165. Ms. Pellechia was discharged and went home.
The next morning James Pellechia called Dr. Chen’s office at 7:07 a.m. and left a message with the answering service. The physician’s assistant in Dr. Chen’s office took the message from the service as follows: “patient had procedure yesterday with Dr. Chen. She is vomiting, nausea and passed out last night. Please call (telephone number).” Dr. Chen returned this call a few minutes later and spoke to Plaintiff James Pellechia, Kathleen Pellechia’s husband. He testified that he told Mr. Pellechia to take her to the emergency room immediately. He also prescribed an anti-nausea medication for his patient. Id. NT 175.
Dr. Chen’s office received a second telephone call from Mr. Pellechia at 12:25 p.m. on January 14, 2010. That message was recorded by the physician’s assistant as “called back, still vomiting, pain worse, now vomiting black liquid and BMs are black.” Id. NT 179. Dr. Chen testified that he called Mr. Pellechia back and told him to take his wife to the hospital immediately. Id. NT 180.
James Pellechia called for an ambulance and Ms. Pellechia was taken to the Pocono Hospital emergency room. There she was found to have dangerously low blood pressure levels and had suffered a myocardial infarction from loss of blood. Testimony of Robert Stark, M.D., August 11,2014, NT 42,44. Ms. Pellechia died on January 26, 2014. Her cause of death was cardiogenic shock and disseminated intravascular coagulation from loss of blood. Id. NT 45.
James Pellechia disputed Dr. Chen’s testimony at trial. Mr. Pellechia contended that after he called Dr. Chen’s office early in the morning on January 14, 2010, Dr. Chen called him back. He told Dr. Chen that his *275 wife was throwing up and had diarrhea and that “black stuff was coming out both top and bottom.” Testimony of James Pellechia, August 7, 2014, NT 94. Dr. Chen asked him what color it was. He said “is it red? And I said ‘no. It’s black sand. It is not red.’ He said ‘Okay. That’s fine. I’ll give her something to settle her stomach. I’ll prescribe some medication to settle her stomach,’ and I [Mr. Pellechia] said fine. I said ‘my pharmacy does not open until 9:00, my Village Pharmacy, but I gave him the phone number and the fax number, and that was the end of our conversation.” Id. NT at 34. Mr. Pellechia went to the pharmacy when it opened at nine, got the prescription filled and came back and gave his wife the medication. Id. When her condition steadily worsened, he decided to drive his wife to the hospital, but she was too weak to walk out of the house. He then called community security officers, who immediately called an ambulance. Id. NT 38.
The jury found that Dr. Chen did not breach the standard of care.
Mr. Pellechia’s first argument in support of his request for a new trial is that the defendants were permitted to present expert testimony beyond the scope of their reports. Pa. R.C.P. 4003.5(c) provides:
(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.
*276 Pa. R.C.P. 4003.5(c).
Our superior court has stated:
It is impossible to formulate a hard and fast rule for determining when a particular expert’s testimony exceeds the fair scope of his or her report. Rather, the determination must be made with reference to particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary’s request, the substance of the facts and opinions to which the expert is expected to testify is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony.
Walsh v. Kubiak, 661 A.2d 416 (Pa.Super. 1995).
Expert reports are adequate when they provide sufficient notice for the opposing party to prepare a rebuttal witness. Martin v. Johns-Mansville Corp., 469 A.2d 655, 659 (Pa. Super. 1983).
Mr. Pellechia argues that defense experts Dr. Adam Elfant, a gastroenterologist, and Dr. Paul Coady, a cardiologist, were permitted to testify outside the scope of their expert reports. Dr. Elfant was called as an expert on Dr. Chen’s standard of care. Mr. Pellechia contended that he called Dr. Chen early in the morning following his wife’s surgery and reported symptoms that should have given the doctor clear signs that there was internal bleeding. Mr. Pellechia alleges that the only instruction Dr. Chen gave him was to obtain a prescription for anti-nausea medication.
Dr. Elfant’s report addressed plaintiff’s three allegations of deviation from the standard of care. These were: 1) performance of a polypectomy on a patient taking Plavix *277 and aspirin; 2) lack of instruction on the risk of hemorrhage and 3) a failure to instruct the patient to seek care after a report of obvious post-procedural bleeding. Report of Dr. Elfant, page 6. Dr. Elfant opined in his report that Dr. Chen’s holding of the Plavix and aspirin on the day of the procedure, his discharge instructions to the patient and his instruction to Mr. Pellechia to take Kathleen Pellechia to the hospital after complications occurred following the surgery all met the standard of care. His report did not mention Dr. Chen’s prescription for an anti-nausea medication following Dr. Chen’s first conversation with James Pellechia. However, in the list of the documents Dr. Elfant reviewed in preparing his report, he listed James Pellechia’s deposition, Dr. Chen’s deposition, and “14. Village Pharmacy.” Id. at 2 and 3. Village Pharmacy is where Dr. Chen sent the prescription for the anti-nausea medication following his telephone conversation with James Pellechia the morning following the endoscopy.
Dr. Elfant was asked during the trial if he had reviewed the Village Pharmacy records and he said he did. August 8, 2014, NT, 65. He was also asked what a review of the records revealed on the morning following Kathleen Pellechia’s surgery. He testified that the records showed that Mr. Pellechia called Dr. Chen’s office on the morning following the surgery and reported symptoms that indicated bleeding. “At that point, Dr. Chen recommended that Mr. Pellechia and Mrs. Pellechia proceed to the emergency room. Subsequently, he phoned in a prescription for an anti-emetic.” Id. NT 97. Plaintiff’s attorney objected to his reference to the prescription as being outside of his expert report. Id. NT 98. This objection was overruled. The question was rephrased:
Q: ...did you have the opportunity to determine if a prescription was ordered at some point during the morning of January 14, and whether that was *278 appropriate in light of the orders by Dr. Chen to go to the emergency room?
A: Right. So if I interpret your question correctly, was it okay to order a prescription and at the same time tell a patient to go to the emergency room? And the answer is absolutely. We do that on an everyday basis in clinical practice, and there’s several reasons for that. Most importantly, the job of an emergency room is to basically triage. We see a patient- and I worked as an ER doctor during my training, so I know exactly what it was. Your job is to triage. The patient comes into the ER. You make a decision. Is this patient critically ill, or are they not critically ill? What’s the acute care necessary for this patient? And then I make a decision, do I admit them to the hospital, or do I send them home?
Now as a practicing clinician in the community and outside the hospital, I know when I am sending patients to the emergency room this is generally what happens. So it’s not uncommon where I get a phone call from a patient where I say, Listen, you know what? You are having stomach pain, I am not comfortable with that, or you are having some symptoms, especially after a procedure, I want you to go the ER, get an x-ray. As long as there’s no perforation or no major event, go home. You know, that way, you can pick up your prescription on the way home on the way there, whatever you want to do and you can treat your symptoms at home in the comfort of your own home. They are not mutually exclusive by any sense of the imagination.
Id. NT 102-103.
There was no suggestion in plaintiff’s case that Dr. Chen’s prescription of that particular drug was dangerous to the patient. Mr. Pellechia’s complaint was that prescribing the drug was the only thing Dr. Chen did *279 that morning; he didn’t tell Mr. Pellechia to immediately take his wife to the emergency room because she might be bleeding internally. That was the credibility issue the jury had to decide about standard of care. Did Dr. Chen tell James Pellechia to take his wife to the hospital or not? Dr. Elfant testified that if Dr. Chen didn’t tell Mr. Pellechia to take Kathleen Pellechia to the hospital that morning, he would not have met the standard of care. Id. NT 137. Whether Dr. Chen prescribed that particular drug was not consequential. James Pellechia used the prescription and the fact that he went out that morning and filled it to support his testimony that he wasn’t told to take his wife to the hospital. The jury decided this question of credibility against Mr. Pellechia.
The purpose behind Rule 4003.5 is to avoid unfair surprise, and this purpose was met at trial. In Brady v. Ballay, Thornton, Maloney Medical Associates, Inc., 704 A.2d 1076, 1082 (Pa. Super. 1997) our superior court stated:
The discrepancy between the expert’s pretrial report and his trial testimony was not of a nature that would have prevented the [plaintiffs] from preparing a meaningful response, or which would have misled them as to the nature of the appropriate response.”
Id. at 1082.
Dr. Elfant’s testimony that prescribing the anti-emetic was not a breach of the standard of care did not come as a surprise. Plaintiff’s expert, Dr. Loughrey, testified to the same thing on direct examination:
Q: And Doctor, would it have been a breach of the standard of care to call in that medication at that time?
A: It’s not necessarily a breach to call in the medicine. *280 It’s a breach to not follow up with more intensive evaluation of the patient’s complaint.
Q: What should have been done at that point?
A: She should have been taken to the hospital immediately.
August 7, 2014, NT, 177.
See Oxford Presbyterian Church v. Weil-McLain Co., Inc., 815 A.2d 1094, 1101 (Pa. Super. 2003) (Prejudice not shown where another witness properly testified to the same thing.) Also, where a party has raised the issue before the jury, the opposing party should be given an opportunity to respond. Daddona v. Thind, 891 A.2d 786, 807 (Pa. Cmwlth. 2006). Dr. Elfant was not testifying about different issues entirely, such as damages when the report was only about negligence. See Estate of Hannis by Hannis v. Ashland State General Hosp., 554 A.2d 574, 576 (Pa. Cmwlth. 1989), or the necessity of surgery, when the report only concerned whether the surgery was performed negligently. See Woodard v. Chatterjee, 827 A.2d 433, 443 (Pa.Super. 2003).
Plaintiff claims that Dr. Coady also testified about the anti-emetic prescription. However, a review of the trial transcript does not reveal any testimony by Dr. Coady on this subject.
Mr. Pellechia next asserts that improper character testimony was permitted at trial. Several nurses, particularly Lori Beloni, Deborah Dietrich, and Jacqueline Venitiere, and physician’s assistants, Tiffany Mazur and Marissa Guarino, were permitted to testify about Dr. Chen’s reputation for honesty as well as his routine in instructing his patients. Counsel did not object to Ms. Dietrich’s, August 6, 2014, NT 285, or Ms. Guarino’s *281 August 8, 2014, NT 26, testimony. Plaintiff’s counsel did not object to the form of the question in Ms. Beloni’s and Ms. Ventiere’s, testimony, Aug. 6, 2014, NT at 235, 264. Ms. Beloni was asked:
Q: Ma’am, with your experience in dealing with Dr. Chen, have you always found him in the post-operative procedure setting to be honest and clear with his instructions given to patients that he is treating?
A: Yes.
MR. ABRAHAMSEN, JR.: Same objection, your Honor.
THE COURT: I believe the rule requires you to ask if she’s familiar with his reputation for the trait of honesty in that setting. So I’ll sustain the objection.
MR. DOHERTY, III: I’ll reword it then your Honor.
Q: Ma’am, are you familiar with, or do you have knowledge of Dr. Chen’s reputation in the postoperative setting dealing with patients?
A: Yes.
Q: And what is that reputation?
A: It’s a good reputation. He would come out and speak with his patients after every procedure, and he would give them instructions.
August 6, 2014, NT at 235.
No objection was raised to this question or the response. The response mentioned a good reputation, but provided evidence of habit, rather than reputation.
Ms. Ventiere was asked:
*282 Q: And have you — for the years of working there, are you familiar with the reputation of Dr. Chen for honesty and post-op instructions within the community?
A: Yes.
MR. ABRAHAMSEN, JR.: Objection, your Honor. It’s the same objection. They haven’t laid the proper foundation, and she’s not a witness qualified to testify to that.
MR. DOHERTY, JR.: I think I have asked the foundation question.
THE COURT: She said she’s familiar with his reputation. I’ll overrule the objection.
Q: What would be that reputation for honesty and straightforward in telling his patients everything?
A: All I can say is that after every procedure, Dr. Chen came out and spoke to his patients, went over the procedure and gave them specific instructions as to what they should do post-operatively.
August 6, 2014, NT at 264.
Again, no objection was raised to this response. The response provided evidence of habit, rather than reputation.
Tiffany Mazur was asked:
Q: Okay. And, Ms. Mazur, as a physician’s assistant practicing for eight years and having experience with Dr. Chen, did you have an understanding of what his reputation was in the community for providing medical care and providing patient care?
MR. ABRAHAMSEN: Objection, your Honor. Character testimony in this setting is not proper. In a *283 criminal setting, there might be character testimony with regard to a defendant’s reputation for truth and honesty, but in this setting, particularly with an employee of Dr. Chen, that’s not permissible under the rules of evidence.
MR. DOHERTY, III: Your Honor, this issue has already been raised and ruled upon by the court with the ambulatory center nurses. I set the appropriate foundation as the court required earlier. It’s the same exact profile, your Honor.
THE COURT: I’m going to overrule the objection.
MR. DOHERTY: Would you like me to repeat the question?
A: No. Chen actually had a very reputable standing in the community. He is a veiy compassionate, caring physician. He always took his time with patients. He was very well—
THE COURT: The question ma’am is, what was his reputation in the community?
A: He had a very good reputation in the community. He was very well respected and well rounded.
THE COURT: His reputation in the community for what was the question?
MR. DOHERTY, III: Patient care.
August 8, 2014, NT 12, 13.
No objection was raised to these responses.
In civil actions evidence of good character or reputation:
‘is inadmissible unless directly in issue or involved in *284 the nature of the proceedings, and even then evidence of good character is not admissible unless and until it is attacked by evidence to the contrary. * * * It is the nature of the issue itself, and not the consequences to be apprehended from the result, that puts character in issue, and therefore the mere fact that the act in question is indictable if proved, or that fraud is charged in the .pleadings is insufficient. To be in issue in a technical sense, character must be of particular importance and therefore a material fact in the case.’ Henry, Penna. Evidence (4th ed. 1953) s 152 (Footnote omitted.)
Greenberg v. Aetna Ins. Co., 235 A.2d 582, 584 (Pa. 1967).
The Pennsylvania Rules of Evidence provide in Rule 608:
(a) Reputation evidence. A witness’s credibility may be attacked or supported by testimony about the witness’s reputation for having a character for truthfulness or untruthfulness. But evidence of truthful character is admissible only after the witness’s character for truthfulness has been attacked. Opinion testimony about the witness’s character for truthfulness or untruthfulness is not admissible.
Pa. Rule of Evidence 608(a).
Thus, a witness’s credibility may be supported by testimony about the witness’s reputation for having a character for truthfulness. However, such evidence is admissible only after “the witness’s character for truthfulness has been attacked.” Pa.R.E. 608(a).
Here Dr. Chen’s character for truthfulness had been attacked; Mr. Pellechia testified that Dr. Chen was lying about advising him to take Katherine Pellechia to the hospital early in the morning following the surgery. August 7, 2014, NT 37. Plaintiff’s counsel made clear in opening *285 statements that Dr. Chen would not be telling the truth if he testified that he told Mr. Pellechia to take Kathleen to the hospital during this early call. August 6, 2014, NT, 40. With this foundation, the defense was permitted to ask questions about Dr. Chen’s reputation for truthfulness or honesty in accordance with Rule 608.
The witnesses’ answers did not always directly answer that question. In Ms. Beloni and Ms. Ventiere’s testimony, they provided evidence of habit or routine, which was admissible under Rule 406, although defense counsel did not argue that the habit rule applied. No objection was made to the answers as given. “Error in allowing improper questions may be cured by answers which contain only admissible information.” Bernstein, Pennsylvania Rules of Evidence, Gant Law Books, Rule 103(9), p. 36, citing Pulliam v. Fannie, 850 A.2d 636, 642 (Pa. Super. 2004).
Character evidence was received without objection from Marissa Guarino, August 8, 2014, NT 26 and from Deborah Dietrich. August 6, 2014, NT 285. Their testimony did not differ substantially from the testimony of Tiffany Mazur. “An error which, viewed by itself, is not minimal, may nonetheless be harmless if properly admitted evidence is substantially similar to the erroneously admitted evidence.” Commonwealth v. Story, 383 A.2d 155, 165 (Pa. 1978).
The admission of defense character evidence was warranted by the plaintiff’s attack on Dr. Chen’s character for truthfulness. Plaintiff’s objections went to whether defense character evidence should be admitted generally in this civil case. No specific objections were made to opinions or reputation about other characteristics of Dr. Chen. To the extent that this evidence was improperly admitted, other witnesses were allowed to testify to the same points without objection. I do not find that there was *286 such prejudice to the plaintiff on this issue as to require a new trial.
Finally, Mr. Pellechia asserts that plaintiff’s expert, Dr. Stark, was improperly cross-examined about his licensure. The defense cross-examined Dr. Stark concerning disciplinary action taken in Connecticut against Dr. Stark’s medical license. Aug. 11, 2014, NT, at 21. The cross-examination occurred during the voir dire on Dr. Stark’s qualifications:
MR. DOHERTY, JR. Q: Okay. Now doctor, can we agree that the state of Connecticut took disciplinary action against your license?
MR. ABRAHAMSEN: Objection. Objection, your Honor. Objection. Can we approach?
THE COURT: Yes.
(Sidebar discussion held off the record.)
MR. DOHERTY, JR.: May I continue your Honor?
THE COURT: Yes.
Q: Doctor, I don’t know if you remember my question. Do you remember, and is it true, that the state of Connecticut imposed disciplinary action against your license; is that true?
A: Yes.
Q: And as a result of a disciplinary action, they reprimanded your license?
A: Yes.
Q: And you sent or signed what’s known as a consent order to the Department of Public Health, and that’s *287 your name on the left. It gives the petition number and the consent order, correct?
A: Yes.
Q: And if we can go to the last page. There’s no question that you agreed to the contents of the consent order?
A: That’s correct.
Q: And in the agreement, you waived the right to have a hearing and to challenge any allegations that were the basis for the consent order?
A: Right.
Q: And you agreed that for a period of time certain types of tests that you performed would be monitored by other cardiologists?
A: Yes.
Q: And you agree that this document could be a permanent document on file in the state of Connecticut?
A: Yes.
Q: And you agreed that this document can be sent to the National Data Bank?
A: Yes.
Q: And in fact Doctor, if we go on the website for your name, this document comes up, doesn’t it?
A: I’m not sure.
August 11, 2014, NT, 19-21.
The traditional procedure for testing an expert’s qualifications is through voir dire of the expert’s
*288 qualifications. Vicari v. Spiegel, 989 A.2d 1277 (Pa. 2010). This procedure continues to be appropriately used following the passage of the Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. §1303.101 et. seq. The Pennsylvania Supreme Court stated in Anderson v. McAfoos, 57 A.3d 1141 (Pa. 2012):
There is no general legal requirement that an objection to a proposed expert’s qualifications under the MCARE Act be made before voir dire. We also do not regard a case management order which merely establishes deadlines for the filing of pre-trial motions as creating such a requirement. As such, appellees cannot be faulted for proceeding in accordance with the traditional procedure of testing an expert’s qualifications through the voir dire process. Cf. Vicari, 605 Pa. at 392, 989 A.2d at 1284 (“Determining whether one field of medicine is ‘related’ to another with respect to a specific issue of care is likely to require a supporting evidentiary record and questioning of the proffered expert during voir dire.”).
Id. at 1151.
The MCARE Act restricts the qualification of experts in professional malpractice actions in Section 512. That section provides as follows:
§ 1303.512. Expert qualifications
(a) General rule. — No person shall be competent to offer an expert medical opinion in amedical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
*289 (b) Medical testimony. — An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
(1) Possess an unrestricted physician’s license to practice medicine in any state or the District of Columbia...
40P.S. §1303.512.
Thus, “to qualify as a medical expert for purposes of Section 1303.512(b)(1) of the MCARE Act, a physician must possess a valid physician’s license without limitations or conditions which restrict in any way the physician’s ability to practice medicine.” See 40 P.S. § 1303.512. Cimino v. Valley Family Medicine, 912 A.2d 851, 855 (Pa. Super. 2006).
Plaintiff contends that this action by Connecticut was irrelevant to Dr. Stark’s qualifications as a cardiologist. Plaintiff argues in his brief that the disciplinary action against Dr. Stark was taken following a malpractice action in Connecticut which was “agreed to” by the doctor. However, no record of those disciplinary proceedings was made other than the defense voir dire. The voir dire questions properly focused on whether Dr. Stark possessed “an unrestricted physician’s license to practice medicine” in Connecticut, where his practice was located. Dr. Stark agreed that he had been subject to a professional disciplinary action by the State of Connecticut. For some period of time, certain tests he performed were monitored by other cardiologists as a result of this disciplinary action.
The defense did not seek to disqualify Dr. Stark as an expert witness due to the existence of this restriction on his license. However, it was the proper subject of inquiry during voir dire on qualifications and the objection to it was properly denied.
*290 Plaintiff’s motion for new trial will be denied for the reasons stated in this opinion.
ORDER
And now this 12th day of February, 2015, upon consideration of James Pellechia’s motion for a new trial and the briefs and arguments of both parties, the motion for a new trial is denied.